Green, J.
delivered the opinion of the court.
The first question to be considered in this case, is? whether Stubblefield purchased half the warrant by which the land in controversy was secured from Sloan, the original owner. The evidence resorted to by the *509 complainants to show this purchase, is to be found in the depositions of Thomas Stubblefield, William Donelly and Green Woods, and the covenant between Sloan and Stubblefield of the 18th June, 1808. Although, probably, the testimony derivable from either of these sources, Jaken by itself, would not be sufficient to establish the fact, yet when they are all taken together, (leading as they do, to the same conclusion,) the fact of the purchase and transfer are sufficiently proved.
Woods heard the parties speak upon the subject, and from them he understood that they were joint owners. He expressly states, that he heard Sloan say, that one half the land belonged to Armstead Stubble-field. The covenant referred to in the third article, indicates most strongly the same fact. Although it is not stated that Stubblefield was owner of any part, yet it recognizes Sloan as being owner of only one half. Donelly drew and witnessed the covenant, in which it is thus stated that Sloan was only half owner; and at that time he heard both Sloan and Stubblefield say, that they were joint owners of the tracts of land referred to in the third article. Thomas Stubblefield states the purchase of a 640 acre land warrant, and the payment of the consideration in express terms. This was in 1806 or 1807, two years before the date of the covenant, in which Sloan and Stubblefield both recognized Sloan as owner of only one half. This witness also saw Sloan write on a paper and give it to Stubblefield at the time the contract and payment were made. It is true, this does not directly prove that the paper spoken of was a transfer of the warrant, but as there was no other matter connected with the contract, which required any writing, (the consideration having been paid in hand, in a mare,) we are led strongly to conclude that the writing spoken of was a transfer of the warrant. The credit of this witness is unimpeached, and indeed the *510 manner in which he testifies goes strongly to show that ke ^^(1 the facts correctly. Had he been disposed to commit perjury, it would have been easy for him, without the possibility of detection, to have made the evidence of the transfer much more certain, by stating that he heard the paper read, and that it was a transfer of the warrant. Not having done so, is persuasive evidence of the truth of the facts he details.
This evidence is objected to on the ground, that no affidavit appears by the record to have been made of the loss of the paper, by which to authorize proof of its contents. It is too late to make the objection here. The deposition was read without any objection in the court below; and if an affidavit, laying the ground for the introduction of this evidence in that court, had been made, or the necessity of it waived, such affidavit or waiver, would have formed no part of the record here. To permit an objection to be made here, when it was waived in the court below, would enable a party to entrap his adversary, by raising objections to testimony in this court, which probably might have been obtained had they been made there.
The right of Stubblefield having been established by the facts above mentioned, we come to consider the effect of the covenant before referred to. By the third article, Sloan agrees to convey to Stubblefield two hundred acres of his half of the Buck Spring Cove tract, or two hundred acres of his half of the Boiling Fork tract, in consideration that Stubblefield would convey to Sloan, half of the tract on the Calf Killer, on which the iron works were being erected. It is in proof, that Sloan sold his half of the iron works to Henderson for $1800, and that Henderson afterwards sold said share to Stubblefield. By this means Stubblefield substantially complied with his part of the covenant in that particular. He was therefore entitled to the conveyance from Sloan. The proof shows, that in 1808 or 1810, *511 Sloan sold to Groves, M’Hay and Lockhart, the Buck Spring Cove tract, and that the money agreed to be given, was paid to him and Stubblefield; in what exact proportions, does not appear; but it is presumable from the evidence, that they received for the land, each an equal sum. At least, there is no evidence that Stubblefield received the consideration for the two hundred acres, in compliance with Sloan’s obligation, over and above that to which he was entitled as a joint owner of the land. The Buck Spring Cove tract having thus been disposed of, the Boiling Fork tract remained as the only means Sloan had of complying with his covenant; and Stubblefield became entitled, in equity, to two hundred acres of Sloan’s half of that tract.
On the 17th of January, 1814, Stubblefield, by his deed of that date, assigned to Gideon Pillow, the ancestor of the complainants, for a valuable consideration, all his interest in the tract of land on the Boiling Fork, entered in the name of Sloan, and granted to him by patent dated 8th October, 1812, and No. 4293, as also all his interest in the warrant, No. 2200, on which the entry was made. Pillow thus became entitled to a clear equity in one half, and two hundred acres of the other half of the tract of land in controversy.
We come now to consider, whether the defendants can protect themselves, under the plea of being bona fide purchasers without notice. A power of attorney was executed to Shannon to sell the interest of Sloan’s heirs to this land, dated 3d May, 1814. A deed was executed to M’Knight, (under whom the other defendants claim,) by Shannon, as attorney in fact for Sloan’s heirs, purporting to have been made the 5th of August, 1814. This deed was acknowledged in the Williamson circuit court, the 18th day of November, 1815, and registered the 10th day of December thereafter, in Franklin county, where the land lies. M’Knight, in his *512 answer, states, that at and before the time he made the purchase, he had no notice of the complainant’s equity. He also states that a fair consideration was paid for the land. This statement falls short of the facts necessary to constitute a bona fide purchaser without notice.— There is no statement in this answer, at what time the consideration was paid; nor is it alleged that such payment was made before he had notice of the complainant’s equity. The denial of such notice was essential to the validity of the defence. Murry vs. Winter, 2 John. Ch. Rep. 157. In the case of Dunning vs. Smith, 3 John. Ch. Rep. 345, Chancellor Kent says, “If a purchaser wishes to rest his claim on the fact of being an innocent, bona fide purchaser, he must deny notice, even though it be not charged, and he must deny it positively, not evasively; he must even deny fully, and in the most precise terms, every circumstance from which notice could he inferred.” In the case of Murry vs. Winter, the purchase and deed were made in 1809; Winter had notice in 1810, and did not pay the money until 1812: held, that he was not protected. Sharp proves that M’Knight had notice in the summer of 1814, and the circumstances corroborate this evidence. The answer of M’Knight was filed in 1820. The payment may have been made, for aught that appears, before the filing of the answer, and yet long after he had notice. In order to protect himself, it was ne. cessary for the defendant to deny notice of the plain, tiff’s equity, previously to the execution of the deed and payment of the purchase money; for till then, the transaction was not complete, and therefore, if he had notice before that time, he is bound by it. Sug. on Ven. 530, 556. Neither Westall, Davis or Norwood, deny that M’Knight had notice; and as they claim under him, holding only a bond for a title, and have no deed from him, they are not in a condition to set up the de-fence of being bona fide purchasers without notice *513 The deed from Shannon derived from the tax sale, is not insisted on; and indeed could not avail, as the proof shows that Stubblefield redeemed the land bj the payment of the taxes and fifty per cent, as required by law. It is therefore the opinion of the court, that the complainants are entitled in equity to the land in dispute ; that the chancellor’s decree be reversed, and that the legal title be divested out of the defendants respectively, and vested in the complainants. Shannon is entitled to one third part of the land, as locator, which will be laid off to the defendants, Norwood and Davis, and the remaining two thirds to the complainants. The defendants, Shannon and M’Knight, will be charged with all the costs.
Decree reversed.